# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 8:05CR161 |
| vs. ) | |
| ) | REPORT AND |
| CHARMAR BROWN, ) | RECOMMENDATION |
| ) | |
| Defendant. ) | |

This matter is before the court on the defendant Charmar Brown's MOTION TO SUPPRESS PHYSICAL EVIDENCE (#9). Hearing on the motion was held on August 5, 2005. The transcript of the hearing (#16) was filed on August 16, 2005 at which time the motion was deemed submitted.

The defendant asks that the court suppress any and all evidence derived from the search of his motor vehicle February 6, 2005. Specifically, the defendant alleges the search occurred without a search warrant or a valid consent, in violation of his right to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution. The government counters that the motion should be denied based upon the defendant's verbal and written consent, as well as the officer's decision to impound the vehicle.

## FACTUAL BACKGROUND

Allen Wagner testified that he is a 21-year employee of the Omaha Police Department, currently serving as a police officer in the uniform patrol division (4:10-19). On February 5,

2005 he was employed as a field investigator in the criminal investigation bureau where he worked felony-type crimes – shootings, robberies, rapes, cuttings, and homicides (5:3-8). At approximately 2:45 A.M., he responded to a call directing him to the Creighton University Medical Center where he met other officers in the emergency room parking lot.

Wagner testified he was briefed and told that the defendant, who had arrived in a private vehicle, was currently in the emergency room with a gunshot wound to the leg (6:11-14). On his way to the emergency room, Wagner saw the officers securing a black 2004 Chevy Silverado. As he walked past the vehicle, he noticed blood in the vehicle (9:3-15).

Wagner testified that as he entered the hospital he located the defendant in an examination room, awake and lying in a bed, and that no medical personnel were present (8:13-18). Wagner asked the defendant what happened. The defendant responded that he had been in the area of 16th and Commercial Avenue when three or four black guys pulled him from his vehicle and beat him up. He told Wagner that during the fight he heard several gunshots and later determined he had been shot (9:24-10:4). Wagner asked the defendant who was with him during the altercation, what the suspects looked like, if he had problems with anybody, and why someone would do this to him. The defendant did not answer (10:5-10). Wagner testified that while the defendant did not say how many people were with him, he did say that he was with his cousins (10:13-16). Wagner testified that the defendant was uncooperative and that the defendant failed to provide information about what had

happened. Wagner based his conclusion on the fact that the defendant did not give his cousins' names, or explain why he was assaulted (10:17-25).

Wagner testified he told the defendant that since he was the victim of a crime and there was blood in the vehicle, the crime lab needed to document the blood and it would be up to the defendant if he wanted to provide information. Wagner then asked the defendant about processing his vehicle and the defendant responded that he didn't care. Wagner explained that his desire to process the vehicle was based on the fact that the defendant was a victim and the police needed to document the blood (11:22-25).

Wagner testified that after being told by the defendant that he didn't care about processing the vehicle, he went to the parking lot where he was advised that the vehicle was locked. Wagner returned to the hospital and asked the defendant where the keys were located. The defendant stated he did not know (12:24-13:8). Wagner then noticed the defendant's pants on the floor, picked them up, and patted them down in an unsuccessful attempt to locate the keys (13:6-14).

Wagner testified that after he searched the defendant's pants, he told the defendant that if the crime lab was not able to get into the vehicle to take photos and document the blood, the vehicle would be impounded because it could not be processed at its current location, and that he was trying to save the defendant money by not impounding his vehicle (16:1-12). Wagner then informed the other officers present that the vehicle needed to be impounded, which he explained meant towed to the impound lot (16:13-19).

Wagner testified that at about that time he was informed that the keys had been located in the possession of a third party (13:15-20), the doors to the vehicle had been opened, and that the crime lab was photographing the blood.[1] Wagner was also told that law enforcement had found marijuana in the vehicle. Upon learning of the marijuana, Wagner informed the officers they should not search at this time, but that he would call a drug canine unit (18:9-12). After the dog arrived, Wagner decided that even though the defendant had previously stated that it was okay to process the blood evidence, it would be better to get a signed permission to search so there would be better documentation (18:16-24). Wagner testified he filled out an Omaha Police Department permission to search form (Ex. 1), and had the defendant sign the form (19:3-13). Wagner noted that during his contacts with the defendant he did not threaten him or tell him that he was not going to get medication if he didn't answer questions. Wagner also stated that during his time with the defendant, he did not smell alcohol on the defendant's breath (20:6-20).

On cross-examination Wagner testified he received the call to go to the hospital at about 2:45 A.M. and arrived at the hospital 15 to 25 minutes later, between 3:00 and 3:15 A.M. (21:3-13). Wagner admitted the windows in the defendant's vehicle were tinted, however stated he was able to observe blood on the driver's seat (23:18-22).

Wagner admitted on cross examination that the defendant had been in the emergency room for 30 minutes or longer when Wagner arrived, and that he did not recall if when he arrived the defendant had an IV (24:24-25:6). He admitted he never talked to any of the

---

[1] The government does not argue that a third party consented to the search of the vehicle.

-4-

doctors or nurses to determine whether the defendant had been given any medication, but he did know that the defendant had a "through-and-through" gunshot wound to the lower leg (25:7-10). Wagner again indicated the defendant had told him that he was with his cousins when he got beat up (25:25-26:11).

Wagner testified that when he talked to the defendant, the defendant closed his eyes and kind of rolled his eyes in the midst of the conversation (26:15-23). Wagner also admitted that there were times when he had to tap the defendant to get his attention (26:24-27:1). Wagner stated that during the conversation the defendant could not describe the individuals who beat him up, but he did say that he had never met them before (27:2-9).

On cross-examination Wagner admitted that when he returned to the defendant's room at 3:30 A.M. with the permission to search form, the defendant had an IV in his arm and that he had to tap the defendant to keep him awake during certain questions (32:19-33:9). Wagner also noted that the defendant had a problem holding the pen while signing the form because he had a Pulsax on his index finger (34:6-17). Wagner admitted that prior to the signing, he had not consulted with doctors or nurses as to whether the defendant had received any medication (35:12-15) and that he was informed at a later time the defendant was going to have a CT scan because of concern about a head injury (40:21-41:1).

On redirect examination, Wagner testified that during some of his questions the defendant would kind of close his eyes and pretend to be sleeping and if questions were not focused specifically the defendant would not respond (42:4-19).

Charmar Adonis Brown testified that on February 6, 2005 he was treated at the Creighton University Medical Center for a gunshot wound to the leg (45:3-16). He remembers arriving at the Center, being in pain, and being treated by the medical staff. He does not recall Officer Wagner coming to his hospital room, indicating to him that he wanted to process his vehicle, asking for the keys to the vehicle, or asking him to sign a consent to search form (46:5-21).

Brown testified that prior to being shot he had consumed a half-pint of Hennessy, shared a fifth of Hennessy with a cousin and had gone to a club and consumed several mixed drinks and beer (48:2-9).

On cross-examination Brown again testified that he did not recall talking with any police officers on the night he was shot (50:16-18).

Brown testified that, at the request of his attorney, he obtained from the Creighton Medical Center the medical records of his February 6, 2005 treatment. The records (Ex. 6) were offered and received in evidence without objection (49:6-24). Defendant's medical records indicate that the defendant was admitted to the emergency room at 2:49 A.M. and was in "moderate" pain, alert, and in mild to moderate distress at that time. In addition to the gunshot wound, defendant had abrasions to his jaw and injuries to the right side of his face. At 3:05 A.M., defendant was given 25 mg. of Demerol by IV, together with two other medications. Just after receiving the Demerol, the defendant was "arousable but not oriented." (Ex. 6, p. 8). The records also show that, when he was admitted to the emergency

-6-

room, the defendant was under the influence of alcohol and his ETOH[2] was 185.  Because the defendant was sedated, as well as under the influence of alcohol, the doctors' treatment plan was for admission for observation and frequent neural checks.  Brown was discharged from the hospital at 5:00 P.M. on February 6, 2005.

## LEGAL ANALYSIS

The defendant's vehicle was searched without a warrant.  The government argues that the defendant consented to the search.  The defendant argues that any consent given by him was not knowingly or voluntarily given, primarily because he was under the influence of alcohol and Demerol at the time.

Under the fourth and fourteenth amendments to the United States Constitution,

> searches conducted without a warrant issued upon probable cause are presumptively unreasonable, subject to a few specifically established exceptions. *See Katz v. United States,* 389 U.S. 347, 356-57 (1967).  A search that is consented to is one of those exceptions.  Thus, "[a] warrantless search is valid if conducted pursuant to the knowing and voluntary consent of the person subject to a search."  *United States v. Brown,* 763 F.2d 984, 987 (8th Cir. 1985), *cert. denied,* 474 U.S. 905 (1985).  The government has the burden of proving by a preponderance of the evidence that a subject's alleged consent to a search was legally sufficient to warrant admitting the fruits of the search into evidence.  *See United States v. Matlock,* 415 U.S. 164 (1974).  This burden "'is not satisfied by showing a mere submission to a claim of lawful authority.'"  *United States v. $404,905 in U.S. Currency,* 182 F.3d 643, 649 n.3 (8th Cir. 1999) (quoting *Florida v. Royer,* 460 U.S. 491, 497 (1983) (plurality opinion)).  Rather, the government must show that a reasonable person would have believed, *see United States v. Sanchez,* 156 F.3d 875, 878 (8th Cir. 1998), that the subject of a search gave consent that was "the product of an essentially free and unconstrained choice," *Schneckloth v. Bustamonte,* 412 U.S. 218, 225 (1973), and that the subject comprehended the choice that he or she was making.

---

[2]Ethyl alcohol, ethanol, or beverage alcohol.

>In other words, a person can render a search legal by behaving in a way that would cause a reasonable person to believe that he or she has knowingly and voluntarily consented, whether or not the person actually intends to consent. Thus, "the Fourth Amendment requires only that the police reasonably believe the search to be consensual."  *Sanchez,* 156 F.3d at 878 (citing *Illinois v. Rodriguez,* 497 U.S. 177, 185-86 (1990)).

*United States v. Cedano-Medina*, 366 F.3d 682, 684-85 (8th Cir.), *cert. denied*, 125 S. Ct. 808 (2004) (parallel citations omitted).

In this context, an action is considered voluntary

>if it was the product of an essentially free and unconstrained choice, rather than the product of duress or coercion, express or implied. [*Schneckloth v. Bustamonte,* 412 U.S. 218, 225 & 227 (1973).] The voluntariness of a consent is a question of fact to be determined from the totality of the circumstances surrounding both the environment of the encounter and the nature of the consenting party. *Id.* at 226-27. We consider a variety of factors[3] in determining voluntariness, but we do not apply those factors mechanically. [*United States v. Zamoran-Coronel,* 231 F.3d 466, 469 (8th Cir. 2000).] "The

---

[3]Courts in the Eighth Circuit generally consider the "*Chaidez* factors," *see United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990), to determine if consent was voluntary:

>"Characteristics of persons giving consent" which may be relevant to the question include: (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

*Id*. at 381 (internal citations omitted). Characteristics of "the environment in which consent was given" include:

>whether the person who consented (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred.

*Id*. (internal citations omitted).  The factors should not be applied mechanically, *id*., and no single factor is dispositive or controlling. *United States v. Ponce*, 8 F.3d 989, 997 (5th Cir. 1993).

*United States v. Bradley*, 234 F.3d at 366.

inquiry turns on the totality of the circumstances, which must demonstrate that the police reasonably believed the search to be consensual." *Id.*

*United States v. Morreno*, 373 F.3d 905, 910-11 (8th Cir. 2004) (footnote in original), *vacated on other grounds*, 125 S. Ct. 1053 (2005).

A person's actions may be considered voluntary even if that person is under the influence of drugs. For example,

> In *United States v. Rambo*, 789 F.2d 1289, 1297 (8th Cir. 1986), this court noted:
>
>> We recognize that Rambo was possibly under the influence of a narcotic at the time of his arrest, ... and was highly disturbed. However, the mere fact that one has taken drugs, or is intoxicated, or mentally agitated, does not render consent involuntary. *See United States v. Gay*, 774 F.2d 368, 377 (10th Cir. 1985); *United States v. Elrod*, 441 F.2d 353, 355 (5th Cir. 1971). In each case, "[t]he question is one of mental awareness so that the act of consent was the consensual act of one who knew what he [or she] was doing and had a reasonable appreciation of the nature and significance of his [or her] actions." [*United States v.*] *Elrod*, 441 F.2d at 355.

*United States v. Gipp*, 147 F.3d 680, 686 (8th Cir. 1998).

Keeping in mind that the government must prove by a preponderance of the evidence that the defendant's consent to a search was legally sufficient, I find that the burden has not been met in this instance. The record shows that defendant was under the influence of alcohol when he was admitted to the emergency room at 2:49 A.M. The defendant was given 25 mg. of Demerol at 3:05 A.M., at which time he was described as "arousable but not oriented." Officer Wagner testified he arrived at the hospital between 3:00 and 3:15 A.M. and knew the defendant had been admitted to the emergency room at least 30 minutes before

Wagner's arrival. Thus, it appears that defendant had been given the Demerol before he was interviewed by Officer Wagner. Although Wagner knew that defendant had been shot through the leg, he did not ask medical personnel whether defendant had been given any pain medication. Wagner stated that the defendant closed his eyes and rolled his eyes in the midst of their first conversation, and there were times when he had to tap the defendant to get his attention. The officer admitted that when he returned to the defendant's room at 3:30 A.M. to ask for written permission to search the vehicle, the defendant had an IV in his arm and he had to tap the defendant to keep him awake. The medical records suggest that the defendant was significantly impaired when he signed the consent form. Under these circumstances, the government has not proven by a preponderance of the evidence that it was reasonable to believe that defendant's consent – either verbal or written – to search his vehicle was the product of an essentially free and unconstrained choice.[4]

To the extent the government relies argues that the items found in defendant's vehicle would have been inevitably discovered during an inventory search when the vehicle was impounded, I note that "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 374 (1987). Inventory searches are reasonable when they are conducted according to standardized police procedures. *See id*. at 372; *United States v. Mayfield*, 161 F.3d 1143, 1145 (8th Cir. 1998), *cert. denied*, 526 U.S. 1045 (1999). The complete lack of evidence on the

---

[4] In reaching this conclusion, the court does not mean to imply that Officer Wagner threatened or coerced the defendant.

policies and procedures of the Omaha Police Department with respect to impounding vehicles and conducting inventory searches precludes a ruling in favor of the government on this ground.

## RECOMMENDATION

Because the government has not proven by a preponderance of the evidence that the defendant voluntarily consented to the search of his vehicle or that the vehicle would have been impounded and inventoried pursuant to lawful standardized police procedures,

**IT IS RECOMMENDED** that defendant's MOTION TO SUPPRESS PHYSICAL EVIDENCE (#9) be granted.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED September 15, 2005.**

        **BY THE COURT:**

        **s/ F.A. Gossett**
        **United States Magistrate Judge**